JUDGE CROTTY

08 CV 5294

LAZARE POTTER GIACOVAS & KRANJAC LLP
950 Third Avenue
New York, New York 10022
(212) 758-9300 – telephone
(212) 888-0919 – facsimile



RECEIVED
JUN 10 2008
U.S.D.C. S.D. N.Y.
CASHIERS

ROSENN, JENKINS & GREENWALD, LLP
15 South Franklin Street
Wilkes-Barre, PA 18711-0075
(570) 826-5621 – telephone
(570) 706-3415 – facsimile

Attorneys for Plaintiffs
    *ROBERT W. NAISMITH, PH.D.*
    *and NADIA N. DAILEY*

## IN THE UNITED STATES DISTRICT COURT FOR
## THE SOUTHERN DISTRICT OF NEW YORK

ROBERT W. NAISMITH, PH.D. and
NADIA N. DAILEY,

                    Plaintiffs,

          v.

DATAMONITOR, INC., a wholly owned
subsidiary of Informa plc,

                    Defendant.

CIV. NO. 08 CV 5294 (PAC)(AJP)
          (ECF CASE)

JURY TRIAL DEMANDED

COMPLAINT

Plaintiffs, ROBERT W. NAISMITH, PH.D. and NADIA N. DAILEY (collectively

referred to herein as the "Plaintiffs"), by and through their counsel, Lazare, Potter, Giacovas &

Kranjac, LLP and Rosenn, Jenkins & Greenwald, LLP, as and for their Complaint against the

Defendant, DATAMONITOR, INC., respectfully allege as follows:

## THE PARTIES

1.     The Plaintiff, ROBERT W. NAISMITH, PH.D. ("DR. NAISMITH"), is an adult individual with a residential address at 55 Roosevelt Street, Scranton, Pennsylvania 18505.

2.     The Plaintiff, NADIA N. DAILEY ("MS. DAILEY"), is an adult individual with a residential address at 37 Birch Hill Road, Clarks Summit, Pennsylvania 18411.

3.     The Defendant, DATAMONITOR, INC. ("DATAMONITOR"), which is a wholly owned subsidiary of Informa plc ("Informa"), is incorporated under the laws of the State of Delaware, and maintains a principal place of business at 245 Fifth Avenue, 4th Floor, New York, New York 10016.

## JURISDICTION AND VENUE

4.     Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332 (diversity jurisdiction), as the controversy central to this action arises among and between citizens of different states and the amount in controversy, as set forth below, exceeds seventy-five thousand dollars ($75,000.00).

5.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a) since a substantial part of the events or omissions giving rise to the claims of DR. NAISMITH and MS. DAILEY occurred in this district, and all parties are subject to personal jurisdiction in this district.

## NATURE OF THE CASE

6.     This action seeks a declaratory judgment from this Court that certain restrictive covenants that were negotiated as part of the Plaintiffs' sale of a valuable business enterprise to DATAMONITOR are void and of no further effect.  As detailed below, DATAMONITOR induced the sale by promising the Plaintiffs certain employment -- or, in the event that their employment was terminated, guaranteeing them certain additional consideration.  The restrictive

588556.1

covenants to which the Plaintiffs agreed and would be bound in the event that their employment was terminated were contingent upon the payment by DATAMONITOR of that additional guaranteed consideration. DATAMONITOR, however, wants it both ways -- it terminated the Plaintiffs, breached its agreement to pay them their guaranteed consideration for their business, but now also seeks to hold them to their restrictive covenants. Accordingly, the Plaintiffs bring this action to void said restrictive covenants in light of DATAMONITOR's breach. This action also seeks a money judgment against DATAMONITOR to recoup certain bonus monies that are owed to the Plaintiffs, irrespective of their termination.

### STATEMENT OF FACTS

7.    In December of 2005, the Plaintiffs were the principal shareholders of a company called Life Sciences Analytics, Inc. ("Life Sciences") located in Scranton, Pennsylvania. The business of Life Sciences was the compilation of publicly available information in the pharmaceutical industry, including the creation of research reports, electronic databases, retrieval services, and websites relating to tracking the product pipeline progression of global companies by therapeutic indication, product and trial details, and financial information.

8.    On or about December 21, 2005, after multiple solicitations by DATAMONITOR, the Parties entered into a definitive Stock Purchase Agreement (the "SPA") in which DATAMONITOR agreed to purchase the Plaintiffs' shares in Life Sciences. The consideration for the Plaintiffs' shares was a payment at closing of twelve million dollars ($12,000,000.00).

9.    As further consideration for the sale of Plaintiffs' shares, DATAMONITOR agreed to retain the Plaintiffs as employees of DATAMONITOR, in like capacity and authority

588556.1

that they had had prior to the sale, for a minimum term of four (4) years. Thus, the SPA, in Section 8.3, provided, in part, as follows:

> **Section 8.3     Employment and Non-Compete Arrangements.**
> Prior to the Closing, Robert W. Naismith, Ph.D. and Nadia N. Dailey will agree to remain employed by the Company pursuant to employment and non-compete arrangements substantially in the form of Exhibits B-1 and B-2 annexed hereto and **made a part hereof**.

(Copies of the relevant pages and exhibits from the SPA are attached hereto as Exhibit "A.") (Emphasis added).

10.     Thereafter, and in conjunction with the sale of shares, separate Employment Agreements memorializing the Plaintiffs' continued employment with DATAMONITOR were made a part of the SPA, which are attached hereto as Exhibits "B" and "C."

11.     In his agreement, dated January 11, 2006, DATAMONITOR agreed to employ DR. NAISMITH in the position of Senior Vice President and Managing Director at a salary of two hundred thousand dollars ($200,000.00) per annum for a minimum term of four (4) years. (See Exhibit B.)

12.     In her agreement, dated January 11, 2006, DATAMONITOR agreed to employ MS. DAILEY in the position of Vice President at a salary of one hundred twenty thousand dollars ($120,000.00) per annum for a minimum term of four (4) years. (See Exhibit C.)

13.     Thus, the total additional consideration in the form of salary owed to the Plaintiffs was one million two hundred thousand dollars ($1,200,000.00). Said additional consideration was a material part of the total consideration to be paid for their shares and the Plaintiffs would not have entered into the SPA if DATAMONITOR did not promise to both employ them -- and pay their respective salaries -- for a minimum term of four (4) years.

588556.1

14.    Though DATAMONITOR had the right to terminate either of the Plaintiffs' employment "without cause" before the expiration of the minimum four (4) year term, the Employment Agreements required DATAMONITOR to continue paying the Plaintiffs their full salary for the balance of their four (4) year term.

15.    Specifically, each Employment Agreement contained the following provision regarding termination of their employment by DATAMONITOR:

**Termination of Employment by Company.**

\*          \*          \*          \*

Notwithstanding any other provisions of this Contract, the Company may terminate [Naismith or Dailey] without cause at any time. In the event [Naismith or Dailey] is terminated without cause, the Company shall continue to pay [Naismith's or Dailey's] salary for one (1) year after [his/her] termination, or, if earlier, until the expiration of the Term. [Naismith or Dailey] will not be entitled to any other payments or benefits (except accrued benefits) during this period.

(See Exhibits B & C at 3, respectively.)

16.    In addition to salary, beginning in or about 2006, DATAMONITOR promised to and did pay annual bonuses to the Plaintiffs based on their personal performance and the performance of the Company.

17.    By letter dated May 31, 2007, DATAMONITOR confirmed the terms and formula for calculating DR. NAISMITH's bonus for calendar year 2007. As noted, the range of the bonus, depending upon the size of a certain "bonus pool" would be zero ($0.00) to sixty-two thousand five hundred dollars ($62,500.00). (A copy of the May 31, 2007 letter is attached hereto as Exhibit "D.")

18.    In consideration for the payment for their shares and continued employment, the Plaintiffs were required to agree to certain restrictive covenants that applied throughout the

588556.1

United States for a period of five (5) years. Specifically, Section 5 of the Professional Employee Confidentiality Agreement provided that, in part, as follows:

5)       **Restrictive Covenants**

\*              \*              \*              \*

**5.3)**      After the termination of my employment with Datamonitor for any reason I shall not, whether directly or indirectly and whether on my own behalf of any other person, firm, company or association, and whether as an employee, director, principal, agent, consultant or in any other capacity whatsoever:

(a)      at any time during the period of 5 years immediately following the Termination Date, within the Restricted Area: seek employment from, accepting employment with, or offer to provide services to; or carry on or assist with or otherwise be concerned or interested in, any Competitor, provided that this restriction shall not apply in respect of my employment or engagement by a Competitor if my duties and responsibilities for such Competitor do not involve me in the provision of any goods or services which are similar to or competitive with the Products or Services.

(b)      at any time during the period of 5 years immediately following the Termination Date for the benefit of a business in competition with any business of Datamonitor: offer employment as an employee, partner, officer, fiduciary or independent contractor (herein, collectively "employment") or solicit or entice the employment of any Key Person (whether or not such person would commit any breach of his or her contract with Datamonitor).

(c)      at any time during the period of 5 years immediately following the Termination Date for the benefit of a business in competition with any business of Datamonitor: canvass or solicit the customer of (or procure or assist with the same); or transact or otherwise deal with (or procure or assist with the same) any Customer or Prospective Customer (defined as a prospect in active engagement or negotiations with Datamonitor) in respect of Products or Services, provided that this Clause shall not prohibit general advertising in the press or other media by myself, (or by any person, firm, company or association on my behalf), which is not specifically targeted at or sent to Customers or Prospective Customers.

588556.1

. . . .

(Copies of the executed Professional Employee Confidentiality Agreements are attached hereto

as Exhibits "E" and "F.")

19.     The SPA contained a similarly restrictive five (5) year covenant.  Specifically,

Section 8.1 provides as follows:

> **Section 8.1     Non Competition Agreements.**  The Principals
> hereby covenant and agree that for a period of five years after the
> Closing Date (the "Restricted Period"), the Principals shall not
> engage in business as, or own an interest in, directly or indirectly,
> any partnership, corporation, limited liability company, joint
> venture, or any other form of business entity, whether as a partner,
> shareholder, member, manager, joint venturer, consultant, finder,
> broker, or in any other manner whatsoever, if such entity is
> engaged in whole or in part in any business of the type and
> character engaged in and competitive with that conducted by the
> Company Group as of the Closing Date.

(See Exhibit A.)

20.     Though there was an explicit agreement to employ the Plaintiffs in an executive

level capacity for a four (4) year term, upon information and belief, DATAMONITOR embarked

on a plan to strip Plaintiffs of their role, stature, and authority within the firm.

21.     Thus, beginning within two (2) weeks of their employment, DATAMONITOR

created oppressive, humiliating and intolerable working conditions for the Plaintiffs by, among

other things: (a) reneging on its promises and representations to the Plaintiffs regarding their

ability to manage and operate Life Sciences as they did prior to the sale; (b) denying the

Plaintiffs the ability to hire employees after being instructed to hire employees; (c) routinely

failing to pay on a timely basis the Plaintiffs' life and health insurance premiums; (d) failing to

invoice and bill customers properly; (e) failing to pay on a timely basis for phone service and

other utilities for the Life Sciences Scranton office; (f) failing to properly manage Life Sciences

588556.1

sales accounts; and (g) improperly delaying the payment of sales commissions rightfully owed to Life Sciences employees.

22.     Upon information and belief, DATAMONITOR subjected the Plaintiffs to repeated harassment and intolerable working conditions in an effort to force the Plaintiffs to resign their employment before the expiration of the four (4) year term. Had the Plaintiffs resigned, DATAMONITOR was only required to pay the Plaintiffs' salaries for a one (1) year term.

23.     Notwithstanding DATAMONITOR's harassment, the Plaintiffs refused to resign and devoted substantial time and effort to grow and develop Life Sciences into the leading company in its field.

24.     Indeed, during 2006 and 2007, the Plaintiffs dutifully performed all obligations and responsibilities as employees of DATAMONITOR, and annual revenues for Life Sciences grew from two million dollars ($2,000,000.00) in 2005 to nearly ten million dollars ($10,000,000.00) at the end of 2007.

25.     As a direct result of the Plaintiffs' efforts, Life Sciences, which was purchased by DATAMONITOR in 2005 for twelve million dollars ($12,000,000.00), was valued, upon information and belief, at approximately seventy millions dollars ($70,000,000.00), when it was sold to Informa in June of 2007.

26.     In recognition of their efforts in growing and developing Life Sciences, in calendar year 2006, DR. NAISMITH was paid a bonus of sixty thousand dollars ($60,000.00) and MS. DAILEY was paid a bonus in the amount of one hundred thousand dollars ($100,000.00).

588556.1

27.   Notwithstanding their substantial efforts on the part of DATAMONITOR, on or about January 7, 2008, DATAMONITOR, ostensibly in reliance upon the early termination provisions of their respective Employment Agreements, informed the Plaintiffs that their employment was being terminated "without cause" because of a change in business direction, effective immediately.

28.   In connection with their termination, DATAMONITOR presented the Plaintiffs with an Agreement and General Release.   Pursuant to that document, DATAMONITOR made the final payment under the SPA in the amount of one million five hundred thousand ($1,500,000.00) conditioned upon the execution of said document.   Additionally, DATAMONITOR offered to pay each of the Plaintiffs their respective salaries for a one (1) year period.  (A copy of the Agreement and General Release is attached hereto as Exhibit "G.")

29.   DATAMONITOR exerted considerable pressure on the Plaintiffs to sign the Agreement and General Release immediately upon receipt.

30.   Because their Employment Agreements required that the Plaintiffs be paid the remainder of their four (4) year terms in cases where their employment was terminated "without cause," the amount of "severance" was inadequate and in breach of the SPA and the parties' respective Employment Agreements (the SPA and Employment Agreements are hereinafter collectively referred to as the "Agreement").

31.   Notwithstanding this, three (3) days later, by letter dated January 10, 2008, DATAMONITOR informed the Plaintiffs that it was "withdraw[ing] the severance offer" and advised them that their employment with DATAMONITOR was immediately terminated "for cause in accordance with the terms of your Contract of Employment." (Copies of the January 10, 2008 letters to the Plaintiffs, respectively, are attached hereto as Exhibit "H.")

588556.1

32.   DATAMONITOR's attempted revocation of its offer of severance was invalid and its failure to pay the Plaintiffs their required severance, representing their unpaid salaries for the balance of their employment term (and unpaid consideration for their shares), constitutes a breach of the Agreement.

33.   DATAMONITOR had no basis for any alleged "for cause" termination of the Plaintiffs.  In response to good faith attempts by the Plaintiffs to determine the "cause" for termination, DATAMONITOR, without any specificity, claimed that the Plaintiffs' actions "constituting cause, include, but are not limited to, misconduct, malfeasance, insubordination and/or misappropriation" and that they "are fully aware to their actions."  (A copy of a letter dated January 18, 2008 from DATAMONITOR's counsel is attached hereto as Exhibit "I.")

34.   Thereafter, and despite its breach in failing to pay the Plaintiffs the salary and consideration they are owed, DATAMONITOR has sought to enforce the restrictive covenants. Specifically, the January 18, 2008 letter from DATAMONITOR's counsel also stated as follows:

> Datamonitor specifically reminds your clients of their continuing obligations under the Purchase Agreement and their respective Professional Employee Confidentiality Agreements, including, but not limited to, their non-compete and no solicitation obligations. Datamonitor provided significant consideration for the rights protected by the non-compete and no solicitation provisions, and will actively enforce such rights.

(See Exhibit I.)

35.   DATAMONITOR's "for cause" termination of employment of the Plaintiffs, coming three (3) days after its "without cause" termination of their employment, is without a legal or factual basis and is merely a pretext in order to prohibit the Plaintiffs from engaging in gainful employment by preserving the ostensible viability of the restrictive covenants.

588556.1

36.    As of the date of this filing, DATAMONITOR has refused and continues to refuse to pay the Plaintiffs the bonuses they earned as a result of the work they performed for Life Sciences in calendar year 2007.

## AS AND FOR A FIRST CAUSE OF ACTION

### DECLARATORY JUDGMENT UNDER
### 28 U.S.C. § 2201

37.    The Plaintiffs repeat and reallege the allegations of Paragraphs 1 through 36 set forth above as if more fully set forth herein at length.

38.    A valid case and controversy exists sufficient for this Court to declare the rights and remedies of the parties in that the Plaintiffs have and continue to incur substantial harm and damage as the result of DATAMONITOR's contention that the restrictive covenants contained in the Agreement remain viable and enforceable.

39.    Because DATAMONITOR terminated the Plaintiffs without cause and failed to pay them their salaries and the consideration for entering into the Agreement, the restrictive covenants contained in the Agreement are null and void.

40.    In order to resolve this controversy, the Plaintiffs request that, pursuant to 28 U.S.C. § 2201, this Court should declare the respective rights and duties of the parties in this matter and, in particular, declare that the restrictive covenants in the Agreement with DATAMONITOR are null and void, and that DATAMONITOR has breached their Agreement for terminating their employment "without cause," and without paying the Plaintiffs the requisite consideration in the form of their full salary for the balance of their four (4) year term.

41.    The Plaintiffs have the requisite standing to request this declaration in that they are parties to the Agreement with DATAMONITOR, which contain the restrictive covenants.

588556.1

42.     The SPA and Employment Agreements are inextricably intertwined and the product of one transaction between the parties in that the Plaintiffs would not have sold their shares if they were not promised additional consideration in the form of employment with DATAMONITOR for a term of four (4) years.

43.     This controversy is ripe for determination at this time because the Plaintiffs have been and continue to be harmed by DATAMONITOR's unreasonable request that the Plaintiffs continue to abide by said restrictive covenants.

44.     Declaratory relief is appropriate in this matter because the Plaintiffs have no other adequate remedy at law and the restrictive covenants effectively preclude gainful employment in their field.

## AS AND FOR A SECOND CAUSE OF ACTION

### DECLARATORY JUDGMENT UNDER
### 28 U.S.C. § 2201

45.     The Plaintiffs repeat and reallege the allegations of Paragraphs 1 through 44 set forth above as if more fully set forth herein at length.

46.     A valid case and controversy exists sufficient for this Court to declare the rights and remedies of the parties in that the Plaintiffs have and continue to incur substantial harm and damage as the result of the overbroad restrictive covenants that DATAMONITOR contends are viable, enforceable and reasonable.

47.     In order to resolve this controversy, the Plaintiffs request that, pursuant to 28 U.S.C. § 2201, this Court should declare the restrictive covenants contained in the Agreement as overly broad to protect any legitimate business interest; not reasonable in time and geographic scope; and/or enforcement of the covenant would be unreasonable and unfair to the Plaintiffs

588556.1

because it would effectively preclude them from engaging in any gainful employment, including being employed by entities that do not compete against DATAMONITOR.

48.     The Plaintiffs have the requisite standing to request this declaration in that they are parties to the Agreement with DATAMONITOR, which contain the restrictive covenants.

49.     The SPA and Employment Agreements are inextricably intertwined and the product of one transaction between the parties in that the Plaintiffs would not have sold their shares if they were not promised additional consideration in the form of employment with DATAMONITOR for a term of four (4) years.

50.     This controversy is ripe for determination at this time because the Plaintiffs have been and continue to be harmed by DATAMONITOR's unreasonable request that Plaintiffs continue to abide by said restrictive covenants.

51.     Declaratory relief is appropriate in this matter because the Plaintiffs have no other adequate remedy at law and the restrictive covenants effectively preclude gainful employment in their field.

### AS AND FOR A THIRD CAUSE OF ACTION

### BREACH OF CONTRACT

### DR. NAISMITH v. DATAMONITOR

52.     The Plaintiffs repeat and reallege the allegations of Paragraphs 1 through 51 set forth above as if more fully set forth herein at length.

53.     From January of 2006 through his termination on January 7, 2008, DR. NAISMITH dutifully performed his obligations and responsibilities as an employee of DATAMONITOR, including growing the annual revenue for Life Sciences from two million dollars ($2,000,000.00) in 2005 to nearly ten million dollars ($10,000,000.00) at the end of 2007.

588556.1

54.    Notwithstanding this, and despite a written agreement guaranteeing bonuses, DATAMONITOR has failed and refused to pay DR. NAISMITH any portion of the bonuses he earned as a result of the work he performed for DATAMONITOR in calendar year 2007.

55.    DR. NAISMITH performed all acts and obligations required of him under the Agreement to entitle him to the payment of a bonus, which was paid in calendar year 2006.

56.    DR. NAISMITH has been damaged by DATAMONITOR's breach in an amount to be determined.

## AS AND FOR A FOURTH CAUSE OF ACTION

### BREACH OF CONTRACT

### MS. DAILEY v. DATAMONITOR

57.    The Plaintiffs repeat and reallege the allegations of Paragraphs 1 through 56 set forth above as if more fully set forth herein at length.

58.    From January of 2006 through her termination on January 7, 2008, MS. DAILEY dutifully performed her obligations and responsibilities as an employee of DATAMONITOR, including growing the annual revenue for Life Sciences from two million dollars ($2,000,000.00) in 2005 to nearly ten million dollars ($10,000,000.00) at the end of 2007.

59.    Notwithstanding this, and despite a written agreement guaranteeing bonuses, DATAMONITOR has failed and refused to pay MS. DAILEY any portion of the bonuses she earned as a result of the work she performed for DATAMONITOR in calendar year 2007.

60.    MS. DAILEY performed all acts and obligations required of her under the Agreement to entitle her to the payment of a bonus, which was paid to her in calendar year 2006.

61.    MS. DAILEY has been damaged by DATAMONITOR's breach in an amount to be determined.

588556.1

## AS AND FOR A FIFTH CAUSE OF ACTION

## VIOLATION OF ARTICLE 6 OF THE NEW YORK STATE LABOR LAW

### DR. NAISMITH v. DATAMONITOR

62.    The Plaintiffs repeat and reallege the allegations of Paragraphs 1 through 61 set forth above as if more fully set forth herein at length.

63.    At all relevant times, DATAMONITOR was obliged to comply with the Labor Laws of the State of New York with respect to its employment of DR. NAISMITH.

64.    DATAMONITOR's failure to pay DR. NAISMITH the earned incentive compensation or bonus to which he was entitled for calendar year 2007 constitutes a violation of Article 6, Section 193 of the New York State Labor Law.

65.    Article 6, Section 198 (1-a) of the New York State Labor Law provides:

> 1-a. In any action instituted upon a wage claim by an employee or the commissioner in which the employee prevails, the court shall allow such employee reasonable attorney's fees and, upon a finding that the employer's failure to pay the wage required by this article was willful, an additional amount as liquidated damages equal to twenty-five percent of the total amount of the wages found to be due.

66.    As a result of the foregoing, under the New York State Labor Law, DR. NAISMITH is entitled to an award of his incentive compensation owed for the calendar year 2007, plus liquidated damages equal to twenty-five (25%) of the total amount of the incentive compensation found to be due, together with an award of reasonable attorneys' fees under the aforementioned statute.

588556.1

## AS AND FOR A SIXTH CAUSE OF ACTION

## VIOLATION OF ARTICLE 6 OF THE NEW YORK STATE LABOR LAW

### MS. DAILEY v. DATAMONITOR

67.     The Plaintiffs repeat and reallege the allegations of Paragraphs 1 through 66 set forth above as if more fully set forth herein at length.

68.     At all relevant times, DATAMONITOR was obliged to comply with the Labor Laws of the State of New York with respect to its employment of MS. DAILEY.

69.     DATAMONITOR's failure to pay MS. DAILEY the earned incentive compensation or bonus to which she was entitled for calendar year 2007 constitutes a violation of Article 6, Section 193 of the New York State Labor Law.

70.     Article 6, Section 198 (1-a) of the New York State Labor Law provides:

> 1-a. In any action instituted upon a wage claim by an employee or the commissioner in which the employee prevails, the court shall allow such employee reasonable attorney's fees and, upon a finding that the employer's failure to pay the wage required by this article was willful, an additional amount as liquidated damages equal to twenty-five percent of the total amount of the wages found to be due.

71.     As a result of the foregoing, under the New York State Labor Law, MS. DAILEY is entitled to an award of her incentive compensation owed for the calendar year 2007, plus liquidated damages equal to twenty-five (25%) of the total amount of the incentive compensation found to be due, together with an award of reasonable attorneys' fees under the aforementioned statute.

588556.1

## AS AND FOR A SEVENTH CAUSE OF ACTION

### VIOLATION OF THE PENNSYLVANIA WAGE PAYMENT AND COLLECTION LAW - 43 P.S. § 260.1 ET SEQ.

#### DR. NAISMITH v. DATAMONITOR

72.     The Plaintiffs repeat and reallege the allegations of Paragraphs 1 through 71 set forth above as if more fully set forth herein at length.

73.     DATAMONITOR is an employer as that term is defined under section 260.2a of the Pennsylvania Wage Payment and Collection Law ("WPCL"), 43 P.S. § 260.2a.

74.     DR. NAISMITH's employment was based in Scranton, Pennsylvania.

75.     DR. NAISMITH is an employee under the WPCL.

76.     The bonus for the calendar year 2007 due from DATAMONITOR to DR. NAISMITH constitutes "wages" earned by DR. NAISMITH within the meaning of section § 260.2a of the WPCL.

77.     The failure of DATAMONITOR to pay the bonus to DR. NAISMITH constitutes a violation of the WPCL.

78.     As a result of the foregoing, under the WPCL, DR. NAISMITH is entitled to an award of his bonus owed for the calendar year 2007, plus liquidated damages equal to twenty-five (25%) of the total amount of the bonus found to be due, together with an award of reasonable attorneys' fees under the aforementioned statute.

588556.1

## AS AND FOR A EIGHTH CAUSE OF ACTION

### VIOLATION OF THE PENNSYLVANIA WAGE PAYMENT AND COLLECTION LAW - 43 P.S. § 260.1 ET SEQ.

#### MS. DAILEY v. DATAMONITOR

79.    The Plaintiffs repeat and reallege the allegations of Paragraphs 1 through 78 set forth above as if more fully set forth herein at length.

80.    DATAMONITOR is an employer as that term is defined under section 260.2a of the WPCL.

81.    MS. DAILEY's employment was based in Scranton, Pennsylvania.

82.    MS. DAILEY is an employee under the WPCL.

83.    The bonus for the calendar year 2007 due from DATAMONITOR to MS. DAILEY constitutes "wages" earned by MS. DAILEY within the meaning of section § 260.2a of the WPCL.

84.    The failure of DATAMONITOR to pay the bonus to MS. DAILEY constitutes a violation of the WPCL.

85.    As a result of the foregoing, under the WPCL, MS. DAILEY is entitled to an award of her bonus owed for the calendar year 2007, plus liquidated damages equal to twenty-five (25%) of the total amount of the bonus found to be due, together with an award of reasonable attorneys' fees under the aforementioned statute.

588556.1

WHEREFORE, the Plaintiffs, ROBERT W. NAISMITH, Ph.D. and NADIA N. DAILEY, respectfully request that this Court enter judgment in their favor and against DATAMONITOR, INC. as follows:

      (a)    a declaratory judgment that the restrictive covenants contained in the SPA and DR. NAISMITH's Employment Agreement are null and void;

      (b)    a declaratory judgment that the restrictive covenants contained in the SPA and MS. DAILEY's Employment Agreement are null and void;

      (c)    damages for DATAMONITOR's failure to pay DR. NAISMITH's bonus for the calendar year 2007, in an amount to be determined, plus interest;

      (d)    damages in excess of $75,000.00 for DATAMONITOR's failure to pay MS. DAILEY's bonus for the calendar year 2007, in an amount to be determined, plus interest;

      (e)    an award of all damages which are available under the New York State Labor Law to DR. NAISMITH and MS. DAILEY, as demanded herein, including liquidated damages equal to twenty-five (25%) of the total amount of the incentive compensation found to be due, together with an award of reasonable attorneys' fees under the aforementioned statute;

      (f)    an award of all damages which are available under the WPCL to DR. NAISMITH and MS. DAILEY, as demanded herein, including, but not limited to, the full amount of all bonuses due to DR. NAISMITH and MS. DAILEY for the calendar year 2007, as well as liquidated damages equal to twenty-five (25%) of the total amount of the bonuses due and consequential and incidental damages, together with attorneys fees and costs under the aforementioned statute;

588556.1

(g)    reasonable attorneys' fees and costs; and

(h)    such other relief as the Court deems appropriate and just.

Dated: New York, New York

June 10, 2008

Respectfully submitted:

LAZARE POTTER GIACOVAS & KRANJAC, LLP

BY: _____

Robert A. Giacovas, Esquire
A member of the firm
950 Third Avenue, Fifteenth Floor
New York, NY 10022
(212) 758-9300 – telephone
(212) 888-0919 – facsimile

Attorneys for Plaintiffs
*ROBERT W. NAISMITH, Ph.D.*
*and NADIA N. DAILEY*

Of Counsel:

ROSENN, JENKINS & GREENWALD, LLP
James C. Oschal, Esquire
15 South Franklin Street
Wilkes-Barre, PA 18711-0075
(570) 826-5621 – telephone
(570) 706-3415 – facsimile

588556.1

Exhibit A

(h)    Any final judgment entered or settlement agreed upon in the manner provided in this Section 7.5 shall be binding upon the Indemnifying Party, and shall conclusively be deemed to be an obligation with respect to which the Indemnified Party is entitled to prompt indemnification hereunder.

### Section 7.6    Limitations On and Other Matters Regarding Indemnification.

7.6.1    The Principals shall not have any liability to any Purchaser Indemnified Party with respect to Losses arising out of any of the matters referred to in Section 7.2 until such time as the amount of such liability shall exceed $10,000 in the aggregate (in which case the Principals shall be liable for all Losses in excess of $10,000); provided, however, that the obligation of the Principals to provide indemnity hereunder shall be secured by, and shall in all events be limited to, the sum of One Million Five Hundred Thousand Dollars ($1,500,000) and One Million Dollars ($1,000,000) during the first (1st) through the twelfth (12th) month and the thirteenth (13th) through the twenty fourth (24th) month, respectively, following the Closing Date, of the Purchase Price delivered, simultaneously with the Closing, to the Escrow Agent to be held to secure payment of the Purchaser's claims for indemnification under this Section 7 pursuant to the terms of the Escrow Agreement substantially in the form annexed hereto as Exhibit A.

7.6.2    The indemnity obligations of the Principals under Section 7.2 and of the Purchaser under Section 7.3 shall terminate on such date that is twelve (12) months after the Closing Date; provided, however, that with respect to a breach of the representations and warranties contained in this Agreement relating to Taxes, any Plans, title to the Shares, or title to the Database and intellectual property, such representations and warranties shall survive the Closing until twenty four (24) months after the Closing Date, subject to the limitations on indemnification set forth in Section 7.6.1 hereinabove, that as to matters as to which the applicable Indemnitee has made a claim for indemnification on or prior to such date specifically addressing an actual claim or demand, the obligation to indemnify referred to in the preceding exception shall survive the expiration of such period until such claims are finally resolved and any obligations with respect thereto are fully satisfied.

7.6.3    The parties to this Agreement understand and agree that the rights of the Indemnified Parties set forth in this Article VII are the sole and exclusive remedy of each of the parties hereto with respect to any Loss incurred following the Closing Date in connection with any matter contained in this Agreement.

### ARTICLE VIII

### OTHER AGREEMENTS

**Section 8.1    Non Competition Agreement.** The Principals hereby covenant and agree that for a period of five years after the Closing Date (the "Restricted Period"), the Principals shall not engage in business as, or own an interest in, directly or indirectly, any partnership, corporation, limited liability company, joint venture, or any other form of business entity, whether as a partner, shareholder, member, manager, joint venturer, consultant, finder, broker, or in any other manner whatsoever, if such entity is engaged in whole or in part in any business of

24

the type and character engaged in and competitive with that conducted by the Company Group as of the Closing Date.

**Section 8.2    Nonsolicitation.**  For a period of five years after the Closing Date the Principals shall not, directly or indirectly, hire any person who is an employee of the Company Group as of the Closing Date or was an employee of the Company Group during the three-month period prior to the Closing Date, except as expressly agreed by the Purchaser in writing.

**Section 8.3    Employment and Non-compete Arrangements.**  Prior to the Closing, Robert W. Naismith, Ph.D. and Nadia N. Dailey will agree to remain employed by the Company pursuant to employment and non-compete agreements substantially in the form of Exhibits B-1 and B-2 annexed hereto and made a part hereof..

**Section 8.4    Staff Employment.**  The Purchaser, in consultation with the Principals, will identify key employees of the Company and the Subsidiary ("Key Employee") and the Purchaser intends to continue the employment of such Key Employees, at the locations, and pursuant to compensation arrangements comparable to those, heretofore prevailing; provided, however, nothing herein contained shall impede the Purchaser from (i) relocating the India operation to a new site within the same area, or (ii)  transferring or discharging Key Employees "for cause" or "without cause" or pursuant to a reduction-in-force generally applicable to employees of the Purchaser.

**Section 8.5    Satisfaction of Closing Conditions.**  The parties will use their best efforts to bring about the satisfaction as soon as possible of all the conditions contained in Articles 5 and 6.

**Section 8.6    Conduct of Business, etc.**  From the date hereof until the Closing, except for entering into and performing under this Agreement, each member of the Company Group will conduct the Business in the ordinary course in substantially the same manner in which it previously has been conducted, will not take any action that would cause a breach of Section 3.13 and shall not:

    (a)    acquire any assets except (i) inventories and supplies in the ordinary course of business or (ii) fixed assets pursuant to contractual obligations in place on the date of this Agreement;

    (b)    (i) permit any accounts payable owed to trade creditors to remain outstanding other than in such Company's customary practice or (ii) accelerate, beyond the normal collection cycle, collection of accounts receivable;

    (c)    cancel or terminate its current insurance policies or cause any of the coverage thereunder to lapse, unless simultaneously with such termination, cancellation or lapse, replacement policies providing coverage equal to or greater than the coverage under the canceled, terminated or lapsed policies for substantially similar premiums are in full force and effect;

25

Exhibit B

## CONTRACT OF EMPLOYMENT

### DATAMONITOR INC.

**Robert W. Naismith, Ph.D.,** ("Naismith"), and **Datamonitor Inc.** 245 Fifth Ave, 4th Floor, New York, NY 10016 (the "Company") agree to this Contract of Employment ("Contract"). This Contract sets out the terms of Naismith's employment with the Company.

**Background:**    The Contract was negotiated and agreed to in connection with the Company's purchase of Naismith's shares of Life Science Analytics, Inc.

**General Notes:** The Company reserves the right to make reasonable business related changes to this contract, other than to the four year term of Naismith's employment and base salary.  The Company also reserves the right to direct the terms of Naismith's employment, including job duties.

**Position – Compensation:** Naismith is employed on a fixed-term basis as Senior Vice President and Managing Director, Datamonitor Inc., for a period of 4 years. Naismith's start date is to be determined. The initial salary of the position is $200,000 per annum, paid semi-monthly, subject to increases at the Company's discretion.

**Hours of Work:**  Naismith is expected to devote substantially all of his business time and efforts to the affairs of the Company.

**Vacation Entitlement:** The vacation year runs from January to December.  Naismith is entitled to 15 days paid vacation annually as well as 5 personal days.  Vacation for less than a full year is pro-rated at this rate.  All vacation days should be taken in the same calendar year in which they accrue, unless prior approval is obtained from the manager.  In addition Naismith will be entitled to a number of paid holidays in each calendar year, to be announced at the beginning of each calendar year.

**Retirement Savings and Insurance:**  Naismith is eligible to participate in the retirement savings and insurance plans then available to Senior Vice Presidents of the Company.  The official plan documents will at all times govern the terms of such plans, and the Company reserves the right to change its retirement savings, insurance and other benefit plans at any time without the prior approval of Naismith.  A brief overview of the plans currently offered is as follows:

**Retirement Savings:**  A 401(k) non-matching plan is available to Naismith as of Naismith's start date.

**Health Insurance:** A comprehensive health plan is offered to US employees, when based in the US.  This policy will become effective after one month's service and is subject to employee contribution.

**Long Term Disability:** The Company offers a Phoenix long-term disability plan that becomes effective after 3 months' employment that covers 60% of employees' monthly earnings not to exceed $6,000 monthly.

**Union League Club, New York, New York:**  The Company will reimburse Naismith for the membership costs associated with the Union League Club do not exceed Two Thousand Three Hundred Dollars ($2,300.00) in any calendar year beginning in 2006.

**Business Class Travel:** For all airline flights of over eight hours in duration, Naismith shall be entitled to travel business class.

**Place of Work:** Naismith will be based in Scranton, Pennsylvania. Reasonable travel may be required as part of Naismith's job duties.

**Relations with the Press:** Naismith is not permitted to give interviews or divulge information to the press or any other news media for any purpose connected with the Company or any of its clients without the prior authority of a director.

**Advertising:** No advertisements, booklets, circulars or other form of publicity material, which involves the use of the Company's name or which might be attributable to or associated with the Company may be sent for printing or published without the approval of a director.

**Legal Proceedings:** Naismith is expected to inform the Human Resources Manager immediately should Naismith become involved (either as a party or a material witness) in any civil or criminal legal proceeding.

**Term:** Naismith's employment with the Company will continue for a fixed period of 4 years, subject to the rights of the Company and Naismith to terminate Naismith's employment as hereinbelow set forth, beginning on Naismith's start date ("Term") and shall automatically terminate without the need for notice by either party.

**Termination of Employment by Company:** Notwithstanding any other provisions of this Contract, the Company may terminate Naismith's employment for cause. In such event Naismith will not be entitled to any further payment from the Company except such sums as shall have accrued due at the date of service of such notice.

The following constitute "cause" for termination of Naismith:

- Naismith's conviction of, or plea of nolo contendere to, any crime involving the Company, or to any felony;
- Naismith's commission of any act of theft, embezzlement or misappropriation against the Company or its clients;
- Naismith's misconduct, incompetence, malfeasance, unethical behavior or insubordination; underperformance of Naismith's job duties; or Naismith's wilful or negligent failure or refusal to consistently discharge Naismith's job duties;
- Naismith's sexual or other harassment of, or discrimination toward, any employee, independent contractor or client of the Company; or
- Naismith's use of illegal drugs or abuse of alcohol or legally prescribed drugs.

At any time during the Term of this Contract the Company shall have the right at its absolute discretion to assign no duties, reduced duties or assign alternative duties to Naismith which shall include having the right to exclude Naismith from its premises, and/or to remove Naismith from any or all offices held by Naismith in the Company or in any other company in the Datamonitor Group (including if appropriate the office of trustee of any of the pension schemes of the Company or the Datamonitor Group), and/or to prevent Naismith from discussing its affairs with the Company's (or any other company in the Datamonitor Group's) employees, agents, clients, customers. If the Company shall exercise its rights under this clause, Naismith's entitlement to basic salary and other contractual benefits shall continue, subject always to the rules of any relevant scheme or policy relating to such benefits. Further, at the Company's discretion, it may choose to pay Naismith the remainder of Naismith's salary due under the Term in a lump sum (less applicable deductions), and Naismith's employment with the Company shall immediately cease (at such time, all employment related benefits shall cease but Naismith shall not lose or forfeit any accrued

and/or vested benefits). In exchange for such lump sum payment, Naismith acknowledges Naismith must sign a standard waiver and general release.

Notwithstanding any other provisions of this Contract, the Company may terminate Naismith without cause at any time. In the event Naismith is terminated without cause, the Company shall continue to pay Naismith's salary for one (1) year after his termination, or, if earlier, until the expiration of the Term. Naismith will not be entitled to any other payments or benefits (except accrued benefits) during this period.

**Termination of Employment by Naismith:** Naismith may resign and terminate his employment with the Company at any time upon thirty days' (30) written notice to the Company. Naismith will not be entitled to any payments or benefits (other than accrued benefits) after the effective date of his resignation.

**Termination – General:** Upon termination of employment, Naismith is expected to immediately return up to the Company, (without making notes or copies), all correspondence, documents, specifications, papers, magnetic discs, tapes or other software storage media, price lists, slides, printouts, and any tangible property belonging to the company or related to Naismith's work at the Company, including any such property belonging to clients of the Company. The terms of Naismith's Confidentiality Agreement shall remain in force in the event of a termination for cause or otherwise.

The following documents form part of Naismith's employment contract:

- This Contract
- The Professional Employee Confidentiality Agreement

**Construction:** It is the desire and intent of the parties that the provisions of this Contract shall be enforced to the fullest extent permissible under the laws and public policies applied in each jurisdiction in which enforcement is sought. In the event that any one or more of the provisions of this Contract shall be held to be invalid, illegal or unenforceable, the validity, legality and enforceability of the remainder of this Contract shall not in any way be affected or impaired thereby. This Contract and the provisions contained in it shall not be construed or interpreted for or against either party because that party drafted or revised any of its provisions.

**Choice of Law and Jurisdiction:** This Contract shall be governed by and construed in accordance with the laws of New York State, to the jurisdiction of whose Courts the parties hereto agree to submit.

**No Waiver:** The failure at any time either of the Company or Naismith to require performance by the other of any provision of this Contract shall in no way affect the full right of such party to require such performance at anytime thereafter.

**Successors:** This Contract is binding on and for the benefit of the Company and Naismith and their respective successors, heirs, executors, administrators, and other legal representatives. Neither this Contract nor any right or obligation hereunder may be sold, transferred, assigned, or pledged by the Company (except to an Affiliate) or by Naismith without the prior written consent of the other. However, nothing in this Contract shall preclude the Company from consolidating or merging into or with, or transferring all of substantially all of its assets to, another entity which assumes this Contract and all obligations and undertakings of the Company hereunder.

3

Signed on behalf of Datamonitor Inc.

Name:       Dylan Grey

Position:   Human Resources Manager

Signature:  _Dylan Grey_

Date:       _10/01/06_

I have read this Contract and have been given the opportunity to review, consider and negotiate the terms and conditions here and to seek advice of counsel as I deem appropriate.

Name:       Robert W. Naismith, Ph.D.

Signature:  _Robert W. Naismith_

Date:       _1/11/06_

4

Exhibit C

**CONTRACT OF EMPLOYMENT**

**DATAMONITOR INC.**

**Nadia N. Dailey ("Dailey"), and Datamonitor Inc., 245 Fifth Ave, 4ᵗʰ Floor, New York, NY** 10016 (the "Company") agree to this Contract of Employment ("Contract"). This Contract sets out the terms of Dailey's employment with the Company.

**Background:**   The Contract was negotiated and agreed to in connection with the Company's purchase of Dailey's shares of Life Science Analytics, Inc.

**General Notes:** The Company reserves the right to make reasonable business related changes to this contract, other than to the four year term of Dailey's employment and base salary.   The Company also reserves the right to direct the terms of Dailey's employment, including job duties.

**Position – Compensation:** Dailey is employed on a fixed-term basis as Vice President, Datamonitor Inc., for a period of 4 years. Dailey's start date is to be determined. The initial salary of the position is $120,000 per annum, paid semi-monthly, subject to increases at the Company's discretion.

**Hours of Work:**   Dailey is expected to devote substantially all of her business time and efforts to the affairs of the Company.

**Vacation Entitlement:** The vacation year runs from January to December.   Dailey is entitled to 15 days paid vacation annually as well as 5 personal days.   Vacation for less than a full year is pro-rated at this rate.   All vacation days should be taken in the same calendar year in which they accrue, unless prior approval is obtained from the manager.   In addition Dailey will be entitled to a number of paid holidays in each calendar year, to be announced at the beginning of each calendar year.

**Retirement Savings and Insurance:**   Dailey is eligible to participate in the retirement savings and insurance plans then available to Vice Presidents of the Company.   The official plan documents will at all times govern the terms of such plans, and the Company reserves the right to change its retirement savings, insurance and other benefit plans at any time without the prior approval of Dailey.   A brief overview of the plans currently offered is as follows:

**Retirement Savings:**   A 401(k) non-matching plan is available to Dailey as of Dailey's start date.

**Health Insurance:** A comprehensive health plan is offered to US employees, when based in the US.   This policy will become effective after one month's service and is subject to employee contribution.

**Long Term Disability:** The Company offers a Phoenix long-term disability plan that becomes effective after 3 months' employment that covers 60% of employees' monthly earnings not to exceed $6,000 monthly.

**Place of Work:** Dailey will be based in Scranton, Pennsylvania. Reasonable travel may be required as part of Dailey's job duties.

**Relations with the Press:** Dailey is not permitted to give interviews or divulge information to the press or any other news media for any purpose connected with the Company or any of its clients without the prior authority of a director.

**Advertising:** No advertisements, booklets, circulars or other form of publicity material, which involves the use of the Company's name or which might be attributable to or associated with the Company may be sent for printing or published without the approval of a director.

**Legal Proceedings:** Dailey is expected to inform the Human Resources Manager immediately should Dailey become involved (either as a party or a material witness) in any civil or criminal legal proceeding.

**Term:** Dailey's employment with the Company will continue for a fixed period of 4 years, subject to the rights of the Company and Dailey to terminate Dailey's employment as hereinbelow set forth, beginning on Dailey's start date ("Term") and shall automatically terminate without the need for notice by either party.

**Termination of Employment by Company:** Notwithstanding any other provisions of this Contract, the Company may terminate Dailey's employment for cause. In such event Dailey will not be entitled to any further payment from the Company except such sums as shall have accrued due at the date of service of such notice.

The following constitute "cause" for termination of Dailey:

- Dailey's conviction of, or plea of nolo contendere to, any crime involving the Company, or to any felony;
- Dailey's commission of any act of theft, embezzlement or misappropriation against the Company or its clients;
- Dailey's misconduct, incompetence, malfeasance, unethical behavior or insubordination; underperformance of Dailey's job duties; or Dailey's wilful or negligent failure or refusal to consistently discharge Dailey's job duties;
- Dailey's sexual or other harassment of, or discrimination toward, any employee, independent contractor or client of the Company; or
- Dailey's use of illegal drugs or abuse of alcohol or legally prescribed drugs.

At any time during the Term of this Contract the Company shall have the right at its absolute discretion to assign no duties, reduced duties or assign alternative duties to Dailey which shall include having the right to exclude Dailey from its premises, and/or to remove Dailey from any or all offices held by Dailey in the Company or in any other company in the Datamonitor Group (including if appropriate the office of trustee of any of the pension schemes of the Company or the Datamonitor Group), and/or to prevent Dailey from discussing its affairs with the Company's (or any other company in the Datamonitor Group's) employees, agents, clients, customers. If the Company shall exercise its rights under this clause, Dailey's entitlement to basic salary and other contractual benefits shall continue, subject always to the rules of any relevant scheme or policy relating to such benefits. Further, at the Company's discretion, it may choose to pay Dailey the remainder of Dailey's salary due under the Term in a lump sum (less applicable deductions), and Dailey's employment with the Company shall immediately cease (at such time, all employment related benefits shall cease but Dailey shall not lose or forfeit any accrued and/or vested benefits). In exchange for such lump sum payment, Dailey acknowledges Dailey must sign a standard waiver and general release.

2

Notwithstanding any other provisions of this Contract, the Company may terminate Dailey without cause at any time. In the event Dailey is terminated without cause, the Company shall continue to pay Dailey's salary for one (1) year after her termination, or, if earlier, until the expiration of the Term. Dailey will not be entitled to any other payments or benefits (except accrued benefits) during this period.

**Termination of Employment by Dailey:** Dailey may resign and terminate her employment with the Company at any time upon thirty days' (30) written notice to the Company. Dailey will not be entitled to any payments or benefits (other than accrued benefits) after the effective date of her resignation.

**Termination – General:** Upon termination of employment, Dailey is expected to immediately return up to the Company, (without making notes or copies), all correspondence, documents, specifications, papers, magnetic discs, tapes or other software storage media, price lists, slides, printouts, and any tangible property belonging to the company or related to Dailey's work at the Company, including any such property belonging to clients of the Company. The terms of Dailey's Confidentiality Agreement shall remain in force in the event of a termination for cause or otherwise.

The following documents form part of Dailey's employment contract:

   - This Contract
   - The Professional Employee Confidentiality Agreement

**Construction:** It is the desire and intent of the parties that the provisions of this Contract shall be enforced to the fullest extent permissible under the laws and public policies applied in each jurisdiction in which enforcement is sought. In the event that any one or more of the provisions of this Contract shall be held to be invalid, illegal or unenforceable, the validity, legality and enforceability of the remainder of this Contract shall not in any way be affected or impaired thereby. This Contract and the provisions contained in it shall not be construed or interpreted for or against either party because that party drafted or revised any of its provisions.

**Choice of Law and Jurisdiction:** This Contract shall be governed by and construed in accordance with the laws of New York State, to the jurisdiction of whose Courts the parties hereto agree to submit.

**No Waiver:** The failure at any time either of the Company or Dailey to require performance by the other of any provision of this Contract shall in no way affect the full right of such party to require such performance at anytime thereafter.

**Successors:** This Contract is binding on and for the benefit of the Company and Dailey and their respective successors, heirs, executors, administrators, and other legal representatives. Neither this Contract nor any right or obligation hereunder may be sold, transferred, assigned, or pledged by the Company (except to an Affiliate) or by Dailey without the prior written consent of the other. However, nothing in this Contract shall preclude the Company from consolidating or merging into or with, or transferring all of substantially all of its assets to, another entity which assumes this Contract and all obligations and undertakings of the Company hereunder.

3

Case 1:08-cv-02572-PAC   Document 1   Filed 03/13/2008   Page 33 of 61

Signed on behalf of Datamonitor Inc.

Name:       Dylan Grey

Position:   Human Resources Manager

Signature:  _~Dylan Grey~_

Date:       _10/01/06_

I have read this Contract and have been given the opportunity to review, consider and negotiate the terms and conditions here and to seek advice of counsel as I deem appropriate.

Name:       Nadia N. Dailey

Signature:  _Nadia N. Dailey_

Date:       _1/1/06_

Exhibit D

# ⟩DATAMONITOR

245 Fifth Avenue
4th Floor
New York. NY10016
t: +1 212 686 7400
f: +1 212 686 2626
e: usinfo@datamonitor.com

Thursday, 31 May 2007

## Private and Confidential

Robert Naismith
LSA


Dear Robert,

The aim of this letter is to set out the terms of your variable pay in 2007.

Your bonus range for 2007 is $0 – $62,500.

The amount of bonus you actually receive will depend both upon the size of the Life Science Analytics bonus pool (BU performance) and also your personal performance.

The Life Science Analytics bonus pool has the opportunity to be accrued in full in the following ways:
- 0.75% of all sales for the LSA business unit will go towards its bonus pool
- Once the Life Science Analytics business unit has achieved a contribution figure of £1,760,000, all of its contribution will go towards its bonus pool until it has been accrued in full.
- Any other initiative which has been agreed by the CEO that could contribute to the bonus pool

In addition, if you bring in a consultancy lead, which is then converted to a sale Datamonitor will pay 1% commission on the Net Consultancy Revenue (which is defined as Consultancy Revenues Invoiced, and accrued to your BU P/L, minus External Supplier Costs incurred). This is effective from 1st January 2007 and will be paid out in February 2008.

If, for any reason, you leave Datamonitor or give notice to leave Datamonitor before the 31st December 2007 you will not be entitled to any of the above bonus / consultancy commission.

Please note that the contribution targets and sales are independent of the Ovum acquisition and any future Mergers and Acquisitions as of 1st February 2007.

At the end of this year, your Managing Director will meet with Human Resources to review the size of the pool and allocate a bonus amount to you according to your performance against SMART objectives.

All tasks that you undertake on behalf of Datamonitor will be guided by our five corporate values that were recently launched in the Datamonitor community. Please find attached the five employee values and their definitions.

I wish you the best of luck in achieving all your targets this year.

Kind regards,

Dylan Grey
**Human Resources Director**
Thursday, 31 May 2007

www.datamonitor.com

Datamonitor Plc. Registered in England. Registered No 2306113
Registered Office: 108-110 Finchley R... London NW3 5JJ

Exhibit E

**PROFESSIONAL EMPLOYEE CONFIDENTIALITY AGREEMENT**

**DATAMONITOR**

In consideration of my employment or continued employment by Datamonitor, Inc. ("Datamonitor") and in connection with Datamonitor's purchase of my shares of Life Science Analytics, Inc., I hereby agree to this PROFESSIONAL EMPLOYEE CONFIDENTIALITY AGREEMENT (the "Agreement"):

**1)     Acknowledgement of Confidential Nature of Work**

I understand and acknowledge that the nature of Datamonitor's work is highly confidential, that as an employee of Datamonitor I may learn or assist in developing highly valuable, confidential and sensitive data relating to Datamonitor and its clients, and that providing its clients with appropriate assurances that their confidences will be protected is crucial to Datamonitor's ability to maintain good client relations and to protect Datamonitor's legitimate business interests.

**2)     Definitions**

For the purposes of this Agreement and my employment with Datamonitor, the following definitions apply:

    a)    "Confidential Information" means: (i) any and all information in whatever form relating to the business, finances, products, discoveries, databases, computer programs, data sources, pricing strategies, frameworks and models, and/or marketing, recruiting and compensation practices of Datamonitor; (ii) any and all information in whatever form relating to the business, finances, products, discoveries, databases, computer programs, pricing strategies, frameworks and models, and/or marketing, recruiting and compensation practices of Datamonitor's clients, including the identity of clients; (iii) any information of a third party which Datamonitor has an obligation to keep confidential; (iv) any other information which Datamonitor considers to be confidential, sensitive or proprietary. All such Confidential Information shall be considered proprietary trade secrets of Datamonitor.

        Information which otherwise falls within the definition of "Confidential Information" in paragraph (a) above shall not be considered Confidential Information to the extent that I can establish by documentary evidence that: (i) the information has become published and made generally available, or is otherwise in the public domain, without breach of this Agreement; (ii) the information was given to me by a third party who is not obligated to maintain its confidentiality; (iii) I independently developed the information prior to receiving it from Datamonitor or Datamonitor's clients.

    b)    "Competitor" includes, but is not limited to:

(1)  Decision Resources, Wood Mackenzie, Intrinsiq, Thomson, Mattson Jack, DaVinci Group, Campbell Alliance, PSL group, Mintel, Evaluate Pharma, Windhover, Recombinant Capital, BioCentury, Gerson Lerhman, Leerink Swan, Infinata, ImpactRx, IMS, GfK, Frost & Sullivan and any holding company, parent, subsidiary or related corporate or business entity of the above.  I understand and acknowledge that the foregoing are merely examples of competitors, and that such "Competitors" may change over time.  Datamonitor may, but is under no obligation to, revise this Agreement or otherwise inform me in writing if such Competitors change.

(2)  any other business which sells or provides, (or will sell or provide once operational), products or services in competition with Datamonitor; and

(3)  other entities that I am informed of during the course of my employment.

c)  "Customer" means any person, firm or company who at any time within the period of 12 months immediately preceding the Termination Date was a customer or client of Datamonitor with whom I dealt on behalf of Datamonitor, or for whose account I had overall responsibility during the said period of 12 months;

d)  "Key Person" means a person who is or was, at any time during the 12 months immediately preceding the Termination Date, an employee or consultant of Datamonitor, a director or officer of Datamonitor or employed in the capacity of middle manager or in a more senior capacity, as well as all directors of Datamonitor; provided, however, "Key Person" shall not include Nadia N. Dailey during such period that she is not employed by the Company.

e)  "Products or Services" means any products or services of a kind sold or supplied , by Datamonitor within the period of 12 months immediately preceding the Termination Date, and with which I was substantially concerned or for which I was responsible at any time during the said period of 12 months;

f)  "Prospective Customer" means any person, firm or company who has been engaged in negotiations with Datamonitor with a view to purchasing or contracting in relation to Products or Services supplied by Datamonitor within the period of 12 months immediately preceding the Termination Date being a person, firm or company with whom I dealt or for whom I was responsible on behalf of Datamonitor during the said period of 12 months.

g)  "Restricted Area" means United States

h)  "Termination Date" means the date on which my employment with the Company terminates.

3)  **Nondisclosure of Confidential Information**

Both during and after the term of this Agreement, I agree to preserve and protect confidentiality of the Confidential Information, whatever its form, and whether it is disclosed to me before this Agreement is signed or afterward. Specifically, I agree that:

a)  Unless otherwise expressly authorized in writing to do so by a director of Datamonitor, I will not use or disclose Confidential Information to any person,

2

except as required to carry out my employment duties to Datamonitor.

b) I will not identify any Datamonitor client to persons outside Datamonitor without the permission of that client and the written permission of a director of Datamonitor.

**4)    Return of Materials Upon Termination of Employment**

Upon the termination of my employment with Datamonitor for any reason, I will leave at Datamonitor or return to Datamonitor within two (2) days:

a) Any originals and all copies of all files, notes, documents, slides (including transparencies), computer disks, printouts, reports and other media or property in my possession or control which contain or pertain to Confidential Information.

b) All property of Datamonitor, including, but not limited to, information, mailing lists, supplies, keys, access devices, identification cards and equipment.

c) A written statement declaring that I have retained no property of Datamonitor and/or no materials containing Confidential Information.

**5)    Restrictive Covenants**

5.1) I acknowledge that in the course of my employment I will:

(a) have access to Confidential Information [as defined above];

(b) develop a relationship with Datamonitor's clients, as well as an understanding of Confidential Information relating to Datamonitor's relation to its clients

(c) develop working relationships with other directors, with my direct reports, with colleagues and staff for whom I am responsible.

**5.2)** I further acknowledge that if, after the termination of my employment, I were to be allowed to exploit:

(a) any Confidential Information;

(b) the relationship developed with clients during the course of my employment; or

(c) the working relationships developed with other directors, with my direct reports, with colleagues and staff for whom I am responsible,

In order, directly or indirectly, to compete with Datamonitor, that competition would be unfair and that the restrictions contained in this clause are no more than are reasonably necessary to ensure that Datamonitor is not subject to unfair competition.

**5.3)** After the termination of my employment with Datamonitor for any reason I shall not, whether directly or indirectly and whether on my own behalf or on behalf of any other person, firm, company or association, and whether as an employee, director, principal, agent, consultant or in any other capacity whatsoever:

(a) at any time during the period of 5 years immediately following the Termination

3

Date, within the Restricted Area: seek employment from, accepting employment with, or offer to provide services to; or carry on or assist with or otherwise be concerned or interested in, any Competitor, provided that this restriction shall not apply in respect of my employment or engagement by a Competitor if my duties and responsibilities for such Competitor do not involve me in the provision of any goods or services which are similar to or competitive with the Products or Services.

(b)     at any time during the period of 5 years immediately following the Termination Date for the benefit of a business in competition with any business of Datamonitor: offer employment as an employee, partner, officer, fiduciary or independent contractor (herein, collectively "employment") or solicit or entice the employment of any Key Person (whether or not such person would commit any breach of his or her contract with Datamonitor).

(c)     at any time during the period of 5 years immediately following the Termination Date for the benefit of a business in competition with any business of Datamonitor: canvass or solicit the customer of (or procure or assist with the same); or transact or otherwise deal with (or procure or assist with the same) any Customer or Prospective Customer (defined as a prospect in active engagement or negotiations with Datamonitor) in respect of Products or Services, provided that this Clause shall not prohibit general advertising in the press or other media by myself, (or by any person, firm, company or association on my behalf), which is not specifically targeted at or sent to Customers or Prospective Customers.

5.4)   I acknowledge:

(a)     that each of the foregoing sub-clauses of this Clause 5 constitutes an entirely separate and independent restriction on myself; and

(b)     if any of the restrictions shall be adjudged to be overbroad, void or ineffective for whatever reason but would be adjudged to be valid and effective if it or another restriction were deleted or otherwise modified, in whole or in part, then such restriction shall apply with such deletions or modifications as may be necessary to make it valid and effective.

5.5)   Nothing in this Clause 5 shall prevent me after the termination of my employment with Datamonitor from holding in my own name or jointly or being beneficially interested in any securities of any company or corporation for the time being quoted or listed on any recognized stock exchange, provided that I may not own or have a beneficial interest in no more than 3 per cent of the nominal amount of the issued securities of any Competitor.

6)     **Datamonitor Ownership Rights**

I understand and agree that:

a)     No license or conveyance of any rights or warranty to me is granted or implied by Datamonitor's furnishing or disclosing computer programs, databases, frameworks and/or models to me.

b)     Datamonitor shall retain whatever ownership and other proprietary rights it otherwise has in all computer programs, databases, frameworks and/or models which it furnishes or discloses to me.

4

c) All computer programs, databases, frameworks and/or models, including all related documentation, and all other discoveries and products which I develop, produce or assist in developing or producing in connection with my employment with Datamonitor shall be works for hire and therefore the property of Datamonitor, including without limitation any copyrights or rights of patent pertaining thereto. If for any reason a computer program, database, framework and/or model, or any other discovery or product which I develop or produce, in whole or in part, in connection with my employment with Datamonitor is not considered to be a work for hire, this Agreement shall constitute an irrevocable assignment to Datamonitor of all my right, title and interest therein, including all rights of patent and copyright. I agree to execute at the reasonable request of Datamonitor any subsequent documents which it may require as further evidence of this assignment.

## 7)    Freedom of Contract

I represent and warrant to Datamonitor that I am not now under any duty to any person, firm or corporation, and have no other interest which is inconsistent or in conflict with this Agreement, or which would prevent, limit or impair, in any way, the performance by me of any of the covenants of this Agreement or my employment duties to Datamonitor.

## 8)    Limitation on Use of Information to Purchase or Sell Securities

I understand that, under applicable Federal, state or other laws of the United States and other countries, it is unlawful for anyone, in connection with the purchase or sale of securities, to act upon or make use of material information that is not publicly known and was obtained, directly or indirectly, from the issuer of such securities, and that any such action can give rise to criminal penalties and civil liabilities. In the normal course of my employment with Datamonitor, I may obtain such "inside information". To comply with such laws I agree not to act upon such information in the purchase or sale of securities nor to divulge such information to anyone other than Datamonitor employees or clients as required to carry out my contractual obligations to Datamonitor.

## 9)    Miscellaneous

a) Both during my employment with Datamonitor and after the termination of my employment with Datamonitor for any reason, I agree to provide Datamonitor with such information relating to my past or current treatment of Confidential Information of Datamonitor and its clients or my past or current work assignments for Datamonitor or others, as Datamonitor may from time to time reasonably request in order to determine my compliance with this Agreement. I understand that Datamonitor may contact my future employers to determine my compliance with this Agreement or to communicate the contents of this Agreement to such employers.

b) I affirm that the statement(s) I made to Datamonitor in securing or continuing my employment, including statements regarding convictions, pleadings, judgements or being named as a party in actions for theft, fraud, misrepresentation, larceny, embezzlement, violating securities laws, disclosing trade secrets or other confidential information or breach of a fiduciary duty as well as coverage under

5

fidelity or surety bonds is/are true and accurate.

c)   Any actions which must be expressly approved by Datamonitor under this Agreement may be approved only by a director of Datamonitor and must be in writing.

d)   For purposes of this Agreement, "Datamonitor" shall include any company that is a corporate affiliate of, controlled by, controlling or under common control with Datamonitor.

e)   This Agreement shall be governed by and construed in accordance with the laws of New York State, to the jurisdiction of whose Courts the parties hereto agree to submit.

This Agreement between me and Datamonitor is made effective the date signed by me.


Signed on behalf of Datamonitor Inc.


Name: Dylan Grey

Position:     Human Resources Manager

Signature:    _____

Date: _____ 10/01/06 _____


I have read this Agreement and have been given the opportunity to review, consider and negotiate the terms and conditions herein and to seek advice of counsel as I deem appropriate.


Name: Robert W. Naismith, Ph.D.

Signature: _____

Date: 1/11/06 _____

6

Exhibit F

## PROFESSIONAL EMPLOYEE CONFIDENTIALITY AGREEMENT

### DATAMONITOR

In consideration of my employment or continued employment by Datamonitor, Inc. ("Datamonitor") and in connection with Datamonitor's purchase of my shares of Life Science Analytics, Inc., I hereby agree to this PROFESSIONAL EMPLOYEE CONFIDENTIALITY AGREEMENT (the "Agreement"):

1)    **Acknowledgement of Confidential Nature of Work**

I understand and acknowledge that the nature of Datamonitor's work is highly confidential, that as an employee of Datamonitor I may learn or assist in developing highly valuable, confidential and sensitive data relating to Datamonitor and its clients, and that providing its clients with appropriate assurances that their confidences will be protected is crucial to Datamonitor's ability to maintain good client relations and to protect Datamonitor's legitimate business interests.

2)    **Definitions**

For the purposes of this Agreement and my employment with Datamonitor, the following definitions apply:

a)    "Confidential Information" means: (i) any and all information in whatever form relating to the business, finances, products, discoveries, databases, computer programs, data sources, pricing strategies, frameworks and models, and/or marketing, recruiting and compensation practices of Datamonitor; (ii) any and all information in whatever form relating to the business, finances, products, discoveries, databases, computer programs, pricing strategies, frameworks and models, and/or marketing, recruiting and compensation practices of Datamonitor's clients, including the identity of clients; (iii) any information of a third party which Datamonitor has an obligation to keep confidential; (iv) any other information which Datamonitor considers to be confidential, sensitive or proprietary. All such Confidential Information shall be considered proprietary trade secrets of Datamonitor.

Information which otherwise falls within the definition of "Confidential Information" in paragraph (a) above shall not be considered Confidential Information to the extent that I can establish by documentary evidence that: (i) the information has become published and made generally available, or is otherwise in the public domain, without breach of this Agreement; (ii) the information was given to me by a third party who is not obligated to maintain its confidentiality; (iii) I independently developed the information prior to receiving it from Datamonitor or Datamonitor's clients.

b)    "Competitor" includes, but is not limited to:

(1)    Decision Resources, Wood Mackenzie, Intrinsiq, Thomson, Mattson Jack, DaVinci Group, Campbell Alliance, PSL group, Mintel, Evaluate Pharma, Windhover, Recombinant Capital, BioCentury, Gerson Lerhman, Leerink Swan, Infinata, ImpactRx, IMS, GfK, Frost & Sullivan and any holding

5

company, parent, subsidiary or related corporate or business entity of the above. I understand and acknowledge that the foregoing are merely examples of competitors, and that such "Competitors" may change over time. Datamonitor may, but is under no obligation to, revise this Agreement or otherwise inform me in writing if such Competitors change.

(2)     any other business which sells or provides, (or will sell or provide once operational), products or services in competition with Datamonitor; and

(3)     other entities that I am informed of during the course of my employment.

c)     "Customer" means any person, firm or company who at any time within the period of 12 months immediately preceding the Termination Date was a customer or client of Datamonitor with whom I dealt on behalf of Datamonitor, or for whose account I had overall responsibility during the said period of 12 months;

d)     "Key Person" means a person who is or was, at any time during the 12 months immediately preceding the Termination Date, an employee or consultant of Datamonitor, a director or officer of Datamonitor or employed in the capacity of middle manager or in a more senior capacity, as well as all directors of Datamonitor; provided, however, "Key Person" shall not include Robert W. Naismith, Ph.D. during such period that he is not employed by the Company.

e)     "Products or Services" means any products or services of a kind sold or supplied by Datamonitor within the period of 12 months immediately preceding the Termination Date, and with which I was substantially concerned or for which I was responsible at any time during the said period of 12 months;

f)     "Prospective Customer" means any person, firm or company who has been engaged in negotiations with Datamonitor with a view to purchasing or contracting in relation to Products or Services supplied by Datamonitor within the period of 12 months immediately preceding the Termination Date being a person, firm or company with whom I dealt or for whom I was responsible on behalf of Datamonitor during the said period of 12 months.

g)     "Restricted Area" means United States

h)     "Termination Date" means the date on which my employment with the Company terminates.

3)     **Nondisclosure of Confidential Information**

Both during and after the term of this Agreement, I agree to preserve and protect confidentiality of the Confidential Information, whatever its form, and whether it is disclosed to me before this Agreement is signed or afterward. Specifically, I agree that:

a)     Unless otherwise expressly authorized in writing to do so by a director of Datamonitor, I will not use or disclose Confidential Information to any person, except as required to carry out my employment duties to Datamonitor.

b)     I will not identify any Datamonitor client to persons outside Datamonitor without the permission of that client and the written permission of a director of

6

Datamonitor.

**4)    Return of Materials Upon Termination of Employment**

Upon the termination of my employment with Datamonitor for any reason, I will leave at Datamonitor or return to Datamonitor within two (2) days:

a)    Any originals and all copies of all files, notes, documents, slides (including transparencies), computer disks, printouts, reports and other media or property in my possession or control which contain or pertain to Confidential Information.

b)    All property of Datamonitor, including, but not limited to, information, mailing lists, supplies, keys, access devices, identification cards and equipment.

c)    A written statement declaring that I have retained no property of Datamonitor and/or no materials containing Confidential Information.

**5)    Restrictive Covenants**

5.1)    I acknowledge that in the course of my employment I will:

(a)    have access to Confidential Information [as defined above];

(b)    develop a relationship with Datamonitor's clients, as well as an understanding of Confidential Information relating to Datamonitor's relation to its clients

(c)    develop working relationships with other directors, with my direct reports, with colleagues and staff for whom I am responsible.

5.2)    I further acknowledge that if, after the termination of my employment, I were to be allowed to exploit:

(a)    any Confidential Information;

(b)    the relationship developed with clients during the course of my employment; or

(c)    the working relationships developed with other directors, with my direct reports, with colleagues and staff for whom I am responsible,

In order, directly or indirectly, to compete with Datamonitor, that competition would be unfair and that the restrictions contained in this clause are no more than are reasonably necessary to ensure that Datamonitor is not subject to unfair competition.

5.3)    After the termination of my employment with Datamonitor for any reason I shall not, whether directly or indirectly and whether on my own behalf or on behalf of any other person, firm, company or association, and whether as an employee, director, principal, agent, consultant or in any other capacity whatsoever:

(a)    at any time during the period of 5 years immediately following the Termination Date, within the Restricted Area: seek employment from, accepting employment with, or offer to provide services to; or carry on or assist with or otherwise be concerned or interested in, any Competitor, provided that this restriction shall not apply in respect of my employment or engagement by a Competitor if my duties

7

and responsibilities for such Competitor do not involve me in the provision of any goods or services which are similar to or competitive with the Products or Services.

(b)    at any time during the period of 5 years immediately following the Termination Date for the benefit of a business in competition with any business of Datamonitor: offer employment as an employee, partner, officer, fiduciary or independent contractor (herein, collectively "employment") or solicit or entice the employment of any Key Person (whether or not such person would commit any breach of his or her contract with Datamonitor).

(c)    at any time during the period of 5 years immediately following the Termination Date for the benefit of a business in competition with any business of Datamonitor: canvass or solicit the customer of (or procure or assist with the same); or transact or otherwise deal with (or procure or assist with the same) any Customer or Prospective Customer (defined as a prospect in active engagement or negotiations with Datamonitor) in respect of Products or Services, provided that this Clause shall not prohibit general advertising in the press or other media by myself, (or by any person, firm, company or association on my behalf), which is not specifically targeted at or sent to Customers or Prospective Customers.

5.4)    I acknowledge:

(a)    that each of the foregoing sub-clauses of this Clause 5 constitutes an entirely separate and independent restriction on myself; and

(b)    if any of the restrictions shall be adjudged to be overbroad, void or ineffective for whatever reason but would be adjudged to be valid and effective if it or another restriction were deleted or otherwise modified, in whole or in part, then such restriction shall apply with such deletions or modifications as may be necessary to make it valid and effective.

5.5)    Nothing in this Clause 5 shall prevent me after the termination of my employment with Datamonitor from holding in my own name or jointly or being beneficially interested in any securities of any company or corporation for the time being quoted or listed on any recognized stock exchange, provided that I may not own or have a beneficial interest in no more than 3 per cent of the nominal amount of the issued securities of any Competitor.

6)    **Datamonitor Ownership Rights**

I understand and agree that:

a)    No license or conveyance of any rights or warranty to me is granted or implied by Datamonitor's furnishing or disclosing computer programs, databases, frameworks and/or models to me.

b)    Datamonitor shall retain whatever ownership and other proprietary rights it otherwise has in all computer programs, databases, frameworks and/or models which it furnishes or discloses to me.

c)    All computer programs, databases, frameworks and/or models, including all related documentation, and all other discoveries and products which I develop, produce or assist in developing or producing in connection with my employment

8

with Datamonitor shall be works for hire and therefore the property of Datamonitor, including without limitation any copyrights or rights of patent pertaining thereto. If for any reason a computer program, database, framework and/or model, or any other discovery or product which I develop or produce, in whole or in part, in connection with my employment with Datamonitor is not considered to be a work for hire, this Agreement shall constitute an irrevocable assignment to Datamonitor of all my right, title and interest therein, including all rights of patent and copyright. I agree to execute at the reasonable request of Datamonitor any subsequent documents which it may require as further evidence of this assignment.

**7)    Freedom of Contract**

I represent and warrant to Datamonitor that I am not now under any duty to any person, firm or corporation, and have no other interest which is inconsistent or in conflict with this Agreement, or which would prevent, limit or impair, in any way, the performance by me of any of the covenants of this Agreement or my employment duties to Datamonitor.

**8)    Limitation on Use of Information to Purchase or Sell Securities**

I understand that, under applicable Federal, state or other laws of the United States and other countries, it is unlawful for anyone, in connection with the purchase or sale of securities, to act upon or make use of material information that is not publicly known and was obtained, directly or indirectly, from the issuer of such securities, and that any such action can give rise to criminal penalties and civil liabilities. In the normal course of my employment with Datamonitor, I may obtain such "inside information". To comply with such laws I agree not to act upon such information in the purchase or sale of securities nor to divulge such information to anyone other than Datamonitor employees or clients as required to carry out my contractual obligations to Datamonitor.

**9)    Miscellaneous**

a)    Both during my employment with Datamonitor and after the termination of my employment with Datamonitor for any reason, I agree to provide Datamonitor with such information relating to my past or current treatment of Confidential Information of Datamonitor and its clients or my past or current work assignments for Datamonitor or others, as Datamonitor may from time to time reasonably request in order to determine my compliance with this Agreement. I understand that Datamonitor may contact my future employers to determine my compliance with this Agreement or to communicate the contents of this Agreement to such employers.

b)    I affirm that the statement(s) I made to Datamonitor in securing or continuing my employment, including statements regarding convictions, pleadings, judgements or being named as a party in actions for theft, fraud, misrepresentation, larceny, embezzlement, violating securities laws, disclosing trade secrets or other confidential information or breach of a fiduciary duty as well as coverage under fidelity or surety bonds is/are true and accurate.

c)    Any actions which must be expressly approved by Datamonitor under this Agreement may be approved only by a director of Datamonitor and must be in

9

writing.

d) For purposes of this Agreement, "Datamonitor" shall include any company that is a corporate affiliate of, controlled by, controlling or under common control with Datamonitor.

e) This Agreement shall be governed by and construed in accordance with the laws of New York State, to the jurisdiction of whose Courts the parties hereto agree to submit.

This Agreement between me and Datamonitor is made effective the date signed by me.

Signed on behalf of Datamonitor Inc.

Name: Dylan Grey

Position: Human Resources Manager

Signature: _____

Date: ____05/01/06____

I have read this Agreement and have been given the opportunity to review, consider and negotiate the terms and conditions herein and to seek advice of counsel as I deem appropriate.

Name: Nadia N. Dailey

Signature: _____

Date: ____11/06____

10

Exhibit G

# ❯DATAMONITOR

<u>AGREEMENT AND GENERAL RELEASE</u>

245 Fifth Avenue
4th Floor
NY 10016
t: 212 686 2626
e: usinfo@datamonitor.com

This Agreement and General Release (the "Agreement") by and between DATAMONITOR INC., its present or former successors, assigns, parents, subsidiaries, affiliates, board members, divisions, joint ventures, representatives, shareholders, partners, officers, directors, attorneys, agents and employees (collectively, the "Company"), and ROBERT W. NAISMITH, Ph.D., in his capacity as an individual and on behalf of his heirs, executors, successor, assigns, administrators, attorneys (collectively, "Employee").

WHEREAS, the parties desire to settle fully and finally any and all differences between Employee and the Company, including, but not limited to, any differences that might arise out of Employee's employment with the Company and the separation thereof;

WHEREAS, the parties entered into a Contract of Employment ("Contract of Employment") and a "Professional Employee Confidentiality Agreement" ("Confidentiality Agreement") each of which were fully executed on January 11, 2006;

WHEREAS, the Contract of Employment and Confidentiality Agreement were negotiated and agreed to in connection with the Company's purchase of Employee's shares of Life Science Analytics, Inc.;

WHEREAS, on January 7, 2008, the Company advised Employee that Employee's employment was terminated without cause effective immediately;

WHEREAS, the parties acknowledge that they understand the meaning and effect of the execution of this Agreement;

NOW, THEREFORE, in consideration of the mutual representations, covenants and warranties here the parties agree as follows:

1.      The parties acknowledge that the settlement herein is solely for the compromise of disputed claims, to avoid expense and to terminate all controversy in or claims for damages or relief of whatever nature, known or unknown, existing on the date of this Agreement, in any way growing out of or connected with Employee's employment with, and separation from, the Company. Neither the negotiation, undertaking, agreement, nor execution of this Agreement shall constitute or operate as an acknowledgment or admission of any kind by the Company that the Company has: (a) Committed any unlawful or discriminatory practice; and/or (b) Violated any statute, rule or regulation; and/or (c) Incurred any liability to Employee.

2.      Employee's last day of active employment with the Company was January 7, 2008. The Company shall pay Employee the gross amount of $0 for accrued, unused vacation time via the 29th February 2008 payroll.

3.      In exchange for the releases and promises contained in this Agreement and in full, final, and complete settlement, the parties agree as follows:

Datamonitor Plc  Registered in England  Registered No 2306113
Registered Office  106-110 Finchley Road, London NW3 5JJ

(a)    Instead of paying Employee one year's salary continuation pursuant to the Contract of Employment, that Company will pay Employee a lump sum of $200,000, less applicable deductions, within 15 days of the Company's receipt of this signed Agreement without revocation;

(b)    Employee agrees to, and agrees to comply with, all terms and conditions of Employee's Confidentiality Agreement.

(c)    Assuming full compliance with the terms and conditions of the Stock Purchase Agreement by and among Life Science Analytics, Inc., Robert W. Naismith, Ph.D., Nadia N. Dailey, and Datamonitor Inc., the monies held in escrow pursuant to such parties Escrow Agreement shall be released pursuant to the terms of Escrow Agreement.

(d)    Employee acknowledges and agrees that the Company has paid and/or owes Employee no wages, commissions, bonuses, vacation pay, employee benefits, or other compensation or payments of any kind or nature, other than as provided in this Agreement.

4.    In full and complete settlement of all claims that either party may have with respect to Employee's employment with and/or separation of employment from the Company, Employee hereby expressly waives Employee's right to bring or pursue any lawsuit, grievance, arbitration or administrative proceeding, upon any claims Employee may have or has had against the Company regarding any matter arising on or before the date of execution of this Agreement and including claims with respect to Employee's employment with and/or separation of employment from the Company. Employee hereby irrevocably and unconditionally releases and forever discharges the Company, of and from any actions, charges, causes of actions, suits, obligations, promises, agreements, damages, debts, complaints, liabilities, claims, grievances, arbitrations, costs, losses, rights, expenses and/or any controversies in law or equity of any nature whatsoever asserted or unasserted, known or unknown, suspected or unsuspected, which Employee ever had, now has or hereinafter may have against the Company regarding any matter arising on or before the date of this Agreement, whether the claims were made or not made by either party. Said waiver shall include, but shall not be limited to, any and all claims, grievances, demands for arbitration or causes of action, known or unknown, arising out of, or in any way connected with or relating to Employee's employment with and/or separation of employment from the Company, for breach of contract, implied or express, impairment of economic opportunity, intentional or negligent infliction of emotional distress, *prima facie* tort, defamation, stock option plan or agreement, negligent termination, malicious prosecution, wrongful discharge, retaliatory discharge, discharge in violation of any applicable whistleblower statute or claim or any other tort, whether intentional or negligent, or any claim or cause of action known or unknown, under the Age Discrimination in Employment Act, the Family and Medical Leave Act, Title VII of Civil Rights Act of 1964, the Civil Rights Acts of 1866, 1871, 1984 and 1991, the Equal Pay Act, the Consolidated Omnibus Budget Reconciliation Act ("COBRA"), the Employee Retirement Income Security Act ("ERISA"), the Americans with Disabilities Act, the

2

Rehabilitation Act, the Older Worker Benefits Protection Act, the National Labor Relations Act, the Worker Adjustment and Retraining Act, the New York State Human Rights Act, the New York City Human Rights Law, the New York State Constitution, the Pennsylvania Human Relations Act, or any other federal, state, county or municipal statute, law, rule, regulation or ordinance relating to employment discrimination, employment benefits or employment law. Provided, however, that the foregoing does not affect Employee's right to enforce or obtain judicial or arbitral review, as appropriate, of this Agreement.

5.      Employee shall keep the terms, amount, and fact of this Agreement confidential, and shall not hereafter disclose any information concerning this Agreement to any person, firm, corporation, governmental agency, or other entity, without the prior written consent of the Company. This prohibition does not apply to any filing or related communication with any federal, state, or local taxing authority, to comply with any lawfully issued subpoena, to discuss this Agreement with Nadia N. Dailey, or to seek legal advice regarding this Agreement.

6.      Employee shall not disparage the Company, its employees, officers or agents. Employee shall direct any request for a reference on Employee's behalf to be sent in writing to the Company's Human Resource Director. In response to such written request, the Company shall not disparage Employee and shall provide a standard neutral letter of reference.

7.      Employee is required to return all Company property to the Company, including documents or information in electronic form, and shall not retain, copy, or duplicate and Company property. Employee agrees that Employee has completely and irrevocably assigned to the Company all title and interest in Link 2 Venture ("L2V"). This assignment includes the assignment of all shares (or other financial interest) in L2V as well as all intellectual property (including but not limited to software, copyrights, trademarks and patents) to the Company. Specifically included in such assignment is the ownership of the Link 2 Partner ("L2P") software (and any drafts, plans, data, programs, etc.), and all intellectual property rights associated with L2P. Employee further agrees to execute at the reasonable request of the Company any subsequent documents which it (or its related entities) may require as further evidence of this assignment. Consistent with the foregoing, Employee will forward to Aaron Gutowski all software or documents (in electronic and hard copy form) regarding L2V and L2P, including but not limited to all software, programs, applications, hardware, business plans, licenses, agreements, financial records, accountings, statements, ledgers, and lists or directories of any customers or clients, or potential customers or clients, that Employee or Employee's agents communicated with regarding L2V and or L2P.  Employee agrees to reasonably cooperate with the transition of L2V and L2P to the Company.

8.      Notwithstanding any other provision of this Agreement to the contrary:

(a)      The Company and Employee agree that, by entering into this Agreement, neither Employee nor the Company waives rights or claims that may arise after the date this Agreement is executed.

(b)    The Company and Employee agree that this Agreement shall not affect the rights and responsibilities of the Equal Employment Opportunity Commission (the "EEOC ") to enforce the ADEA and other laws, and further agree that this Agreement shall not be used to justify interfering with Employee's protected right to file a charge or participate in an investigation or proceeding conducted by any federal, state or local fair employment agency, including but not limited to, the EEOC. The Company and Employee further agree that Employee knowingly and voluntarily waives all rights or claims (that arose prior to Employee's execution of this Agreement) Employee may have against the Company, or any of them, to receive any benefit or remedial relief (including, but not limited to, reinstatement, back pay, front pay, damages, and attorneys' fees) as a consequence of any charge filed with the EEOC, and of any litigation concerning any facts alleged in any such charge.

(c)    The Company and Employee agree that, for a period of seven (7) days following the execution of this Agreement, Employee has the right to revoke this Agreement by written notice to Aaron Gutowski, President of the Company. The Company and Employee further agree that this Agreement shall not become effective or enforceable until the eighth (8th) day after the execution of this Agreement; and that in the event Employee revokes this Agreement prior to the eighth (8th) day after the execution of this Agreement, this Agreement, and the promises contained in this Agreement, shall automatically be deemed null and void.

(d)    The Company hereby advises and urges Employee in writing to consult with an attorney prior to executing this Agreement. Employee represents and warrants that the Company gave Employee a period of twenty-one (21) days in which to consider this Agreement before executing this Agreement.

(e)    Employee's acceptance of the monies paid by the Company, as described in Paragraph 3 of this Agreement, at any time more than seven (7) days after the execution of this Agreement shall constitute an admission by Employee that Employee did not revoke this Agreement during the revocation period of seven (7) days; and shall further constitute an admission by Employee that this Agreement has become effective and enforceable.

(f)    If Employee executed this Agreement at any time prior to the end of the twenty-one (21) day period that the Company gave Employee in which to consider this Agreement, such early execution was a knowing and voluntary waiver of Employee's right to consider this Agreement for twenty-one (21) days, and was due to Employee's belief that Employee had ample time in which to consider and understand this Agreement, and in which to review this Agreement with an attorney if Employee so chooses. Employee's initials at the end of this paragraph confirms such waiver. _____

9.    Should any provision of this Agreement be declared or determined by a court or arbitrator to be illegal or invalid, the validity of the remaining provisions shall not be affected thereby and said illegal or invalid provision shall be deemed not to be a part of this Agreement.

4

10.     This Agreement may be amended only by an instrument in writing executed by the parties hereto and when so executed such instruments shall become part of this Agreement. Neither the Employee's Contract of Employment, Confidentiality Agreement nor any of the documents regarding the Company's purchase of the shares of Life Science Analytics, Inc. are amended or modified by this Agreement, except as specifically provided for in paragraph 3(a) above.

11.     This Agreement shall be interpreted, construed, and enforced pursuant to the substantive and procedural laws of the State of New York.

12.     Employee expressly acknowledges, represents, and warrants that Employee has carefully read this Agreement; that Employee fully understands the terms, conditions, and significance of this Agreement; including the releases provided herein; that Employee has had ample time to consider and negotiate this Agreement; that the Company has advised and urged Employee to consult with an attorney concerning this Agreement; and that Employee has executed this Agreement voluntarily and knowingly.

DATAMONITOR INC.                                    ROBERT W. NAISMITH, Ph.D.

By: _____                         _____

Title: _____

Dated: _____                         Dated: _____

STATE OF _____        )
                                )ss.:
COUNTY OF _____        )

On _____, 2008 before me personally came ROBERT W. NAISMITH Ph.D. to me known and known to me to be the individual described in and who executed the foregoing Agreement, and he duly acknowledged to me that he voluntarily and knowingly executed the said Agreement, after having read and understood said document.

_____
Notary Public

5

Exhibit H

# 〉DATAMONITOR

245 Fifth Avenue
4th Floor
New York, NY 10016
t: +1 212 686 7400
f: +1 212 686 2626
e: usinfo@datamonitor.com

January 10, 2008

<u>**VIA OVERNIGHT COURRIER**</u>
<u>**AND EMAIL** robert.naismith@hotmail.com</u>

Robert W. Naismith, Ph.D.
55 Roosevelt Street
Scranton
PA 1805

    **Re:**    <u>**Withdrawal of Severance Offer and**</u>
                   <u>**Notice of Termination for Cause**</u>

Dear Dr. Naismith:

    This letter is to advise you that Datamonitor Inc. withdraws the severance offer presented to you on or about January 7, 2008, and advises you that your employment with Datamonitor is immediately terminated for cause in accordance with the terms of your Contract of Employment. As such, you are not entitled to any further payment from the Datamonitor, except sums that have accrued.

    Datamonitor reserves, and does not waive, any continuing obligations that you may have, including but not limited to, obligations under or pursuant to the Stock Purchase Agreement dated December 21, 2005 (and related or incorporated documents), your Contract of Employment, and your Professional Employee Confidentiality Agreement.  Datamonitor further reserve all rights and remedies.

    Under separate cover, Datamonitor will advise you of your rights to elect to continue health insurance coverage (at your own expense), pursuant to COBRA.

    Should you have any questions, please contact, or have your attorney contact, Datamonitor's attorney as follows:  Joseph B. Cartafalsa, Esq., Putney, Twombly, Hall & Hirson LLP, 521 Fifth Avenue, New York, New York 10175, telephone number (212) 682-0020.

                     Very truly yours,

                     Aaron Gutowski,
                     President

cc:    Hedger & Hedger
       2 Fox Chase Drive
       P.O. Box 915
       Attention: Raymond C. Hedger, Jr., Esq.
       Via fax 717-534-9813
       and via email: rayhedger@hedgerandhedger.com

Datamonitor Plc  Registered in England. Registered No. 2306113
Registered Office: 106-110 Finchley Road, London NW3 5JJ

# ⟩DATAMONITOR

245 Fifth Avenue
4th Floor
January 10, 2008   New York, NY 10016
t: +1 212 686 7400
f: +1 212 686 2626
e: usinfo@datamonitor.com

**VIA OVERNIGHT COURRIER**
**AND EMAIL nadiadailey@hotmail.com**

Ms. Nadia N. Dailey
13024 Maple Drive,
Clarks Summit,
PA, 18411

     **Re:**    **Withdrawal of Severance Offer and**
            **Notice of Termination for Cause**

Dear Ms. Dailey:

    This letter is to advise you that Datamonitor Inc. withdraws the severance offer presented to you on or about January 7, 2008, and advises you that your employment with Datamonitor is immediately terminated for cause in accordance with the terms of your Contract of Employment. As such, you are not entitled to any further payment from the Datamonitor, except sums that have accrued.

    Datamonitor reserves, and does not waive, any continuing obligations that you may have, including but not limited to, obligations under or pursuant to the Stock Purchase Agreement dated December 21, 2005 (and related or incorporated documents), your Contract of Employment, and your Professional Employee Confidentiality Agreement. Datamonitor further reserve all rights and remedies.

    Under separate cover, Datamonitor will advise you of your rights to elect to continue health insurance coverage (at your own expense), pursuant to COBRA.

    Should you have any questions, please contact, or have your attorney contact, Datamonitor's attorney as follows:  Joseph B. Cartafalsa, Esq., Putney, Twombly, Hall & Hirson LLP, 521 Fifth Avenue, New York, New York 10175, telephone number (212) 682-0020.

Very truly yours,

Aaron Gutowski,
President

cc:   Hedger & Hedger
      2 Fox Chase Drive
      P.O. Box 915
      Attention: Raymond C. Hedger, Jr., Esq.
      Via fax 717-534-9813
      and via email: rayhedger@hedgerandhedger.com

**www.datamonitor.com**

Datamonitor Plc. Registered in England. Registered No. 2306113
Registered Office  108-110 Finchley Road. London NW3 5JJ

Exhibit I

# PUTNEY, TWOMBLY, HALL & HIRSON LLP

ESTABLISHED 1866

COUNSELORS AT LAW

521 FIFTH AVENUE

NEW YORK, NEW YORK 10175

(212) 682-0020

TELEFAX: (212) 682-9380

putneylaw.com

DANIEL F. MURPHY, JR.
MICHAEL T. McGRATH
THOMAS A. MARTIN
WILLIAM M. POLLAK
JAMES E. McGRATH, III
CHRISTOPHER M. HOULIHAN
THOMAS M. LAMBERTI
STEPHEN J. MACRI
HARVEY I. SCHNEIDER
MARY ELLEN DONNELLY
JOSEPH B. CARTAFALSA
GEOFFREY H. WARD
ANDREA HYDE
E. PARKER NEAVE
MARK A. HERNANDEZ
JAMES M. STRAUSS
PHILIP H. KALBAN
SEAN H. CLOSE

120 WOOD AVENUE SOUTH
SUITE 600
ISELIN, NEW JERSEY 08830
(732) 632-2506
TELEFAX: (732) 632-2506

1205 FRANKLIN AVENUE
GARDEN CITY, NY 11530
(516) 746-0070
TELEFAX: (516) 746-0599

2500 NORTH MILITARY TRAIL
SUITE 465
BOCA RATON, FLORIDA 33431
(800) 935-8480
TELEFAX: (661) 780-6602

COUNSEL
CHARLES J. GROPPE
ALEXANDER NEAVE
LOUIS A. TRAPP, JR.
DUSTAN T. SMITH

January 18, 2007

**Via E-Mail and Mail**

Robert T. Kelly, Jr., Esq.
Meyers, Brier & Kelly, LLP
425 Spruce Street
Suite 200
Scranton, PA 18503

Re:    **Naismith and Dailey**

Dear Mr. Kelly:

As you know we represent Datamonitor, Inc. with respect to all employment matters concerning Robert Naismith and Nadia Dailey. We write to follow-up on our recent conversations.

We confirm that Datamonitor terminated Mr. Naismith and Ms. Dailey for cause under their respective Contracts for Employment. Their actions constituting cause, include, but are not limited to, misconduct, malfeasance, insubordination and/or misappropriation. Your clients are fully aware of their actions. Given your clients' lack of forthrightness, we are not inclined to discuss this further at this time.

Datamonitor specifically reminds your clients of their continuing obligations under the Purchase Agreement and their respective Professional Employee Confidentiality Agreements, including, but not limited to, their non-compete and no solicitation obligations. Datamonitor provided significant consideration for the rights protected by the non-compete and no solicitation provisions, and will actively enforce such rights.

Robert T. Kelly, Jr., Esq.
January 18, 2008
Page 2

Datamonitor specifically reserves, and does not waive, all rights, causes of action and defenses under the common law and under your clients' respective contracts with Datamonitor.

Please do not hesitate to contact me with any questions or comments.

Very truly yours,

Joseph B. Cartafalsa

JBC/dj
H:\JBC\LTRS\DataM-Naismith-Kelly-Walsh-1-18-08.doc